[Cite as *In re D.T.*, 2012-Ohio-3552.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

IN RE: D.T.

C.A. No.     26344

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF SUMMIT, OHIO
CASE No.     DN 09-09-759

DECISION AND JOURNAL ENTRY

Dated: August 8, 2012

WHITMORE, Presiding Judge.

{¶1}    Appellant, Tiffany T. ("Mother"), appeals from a judgment of the Summit County Court of Common Pleas, Juvenile Division, that terminated her parental rights and placed her minor child in the permanent custody of Summit County Children Services Board ("CSB").  This Court affirms.

I

{¶2}    Mother is the natural mother of D.T., born September 6, 2009.  D.T.'s father lived with Mother and participated in the proceedings below.  Because he is not a party to this appeal, however, this Court will not focus on his role as D.T.'s father.

{¶3}    Five days after D.T.'s birth, CSB filed a complaint, alleging that he was a dependent child for several reasons, including that his home was unsafe and unsanitary and that Mother lacked the ability to care for him due to her cognitive delays and serious, untreated

mental health problems. On November 24, 2009, D.T. was adjudicated a dependent child. He was later placed in the temporary custody of CSB.

{¶4} CSB's primary concerns about Mother's ability to care for D.T. were her untreated mental illness and her cognitive impairment. Mother had been diagnosed with bipolar disorder, depression, and anxiety, but was not then involved in counseling or medication management. Consequently, her moods were not stabilized and she would cycle between periods of depression, during which she spent the entire day in bed, and periods of mania, during which she became agitated, angry, and aggressive. Therefore, one case plan reunification goal required Mother to regulate her mood swings by participating in medication management with a psychiatrist and counseling with a licensed therapist.

{¶5} Mother's cognitive impairment was at a borderline level, meaning that she was not intellectually disabled, but her low level of intellectual functioning and lack of insight impaired her critical reasoning. CSB initially believed, however, that Mother's intellectual limitations could be addressed through intensive parenting classes.

{¶6} Although CSB continued to have concerns about Mother's ability to care for D.T., temporary custody was extended to allow her more time to work on the reunification goals of the case plan. CSB sought permanent custody when the first six-month extension expired, but the trial court extended temporary custody for another six months because Mother had been attending intensive parenting classes, but had not had the opportunity to work directly with D.T. in the classes.

{¶7} For the next six months, Mother was able to work with D.T. in the intensive parenting classes. She worked with the instructor during the first hour of each class. D.T. was brought in for the second hour of each class so Mother could attempt to implement what she had

learned. Throughout the next several months, the instructor continued to have concern about Mother's ability to retain and implement the parenting skills that she had learned. Even with prompting by the instructor, Mother typically was not able to implement the parenting skills that she had been taught. For example, during one exercise, the instructor taught Mother how to administer a liquid medication to D.T. using a medication dropper and water in a labeled medication bottle. When Mother attempted to give the correct dosage of water to D.T., she was unable to properly administer it because she did not understand the label directions or how to use the dropper. The instructor, who worked with Mother on intensive parenting skills for over a year, ultimately concluded that Mother lacked the ability to care for D.T. In addition to Mother's inability to understand and implement basic parenting skills, the instructor was also concerned that Mother's interaction with D.T. was minimal and was affected by her unstable moods.

{¶8} During the second extension period, Mother participated in counseling and medication management, but did not do so on a consistent basis. She told her case manager that she did not want mental health treatment and that she came to the center only because CSB required her to. Although the center recommended that Mother attend counseling sessions twice a month, she saw her counselor only four times over a period of approximately five months. She made little progress during those sessions as she had only begun to develop treatment goals. Mother was eventually terminated from the program due to her lack of participation. After having treatment services available to her for nearly two years, Mother still did not have her mood swings under control.

{¶9} CSB was further concerned that D.T. had been living outside of Mother's custody for his entire life and did not seem to have developed any bond with her. During monitored visits, Mother would tend to sit on the couch and not interact with D.T. When she did interact

with him, she had very little patience, easily became angry, and would often be too forceful or aggressive with him. One visitation specialist characterized Mother's aggression with D.T. as inappropriate and "borderline abusive" because it was apparent that D.T. was emotionally affected by it. Mother was not receptive to any suggestions of the visitation specialist, however, who observed that Mother's interaction with D.T. did not improve during the pendency of this case.

{¶10} D.T. was quiet and timid around Mother because, in the opinion of those who observed their visits, he never knew what type of reaction he would receive from her. D.T. did not go to Mother for help or comfort and witnesses never saw any hugs, kisses, or other affection between the two. In fact, as he grew older, D.T. became more distant from Mother.

{¶11} On the other hand, D.T. was an outgoing and happy child when he was in the foster home, where he had lived for most of his life. He showed affection and had developed a bond with his foster family and was comfortable in that home.

{¶12} Consequently, on September 1, 2011, CSB again moved for permanent custody of D.T., alleging that he had been in the temporary custody of CSB for more than 12 of the prior 22 months, that he could not be placed with either parent within a reasonable time or should not be placed with them, and that permanent custody was in his best interest. By the time of the permanent custody hearing, D.T. was 28 months old and had spent all but two days of his life outside Mother's custody. Following a hearing, the trial court terminated Mother's parental rights and placed D.T. in the permanent custody of CSB. Mother appeals and raises one assignment of error.

II

Assignment of Error

THE JUVENILE COURT COMMITTED PLAIN ERROR BY PROCEEDING TO TRIAL ON THE ISSUE OF PERMANENT CUSTODY WITHOUT PROPER SERVICE OR NOTICE TO MOTHER.

{¶13} Mother does not dispute that the evidence supported the trial court's permanent custody decision because D.T. had been in the temporary custody of CSB for more than 12 of the prior 22 months and permanent custody was in his best interest. Mother's sole assignment of error is that the trial court erred by proceeding with the permanent custody hearing because she had not been properly served with the permanent custody motion.

{¶14} Mother concedes that she is raising this issue for the first time on appeal. When the issue of service of the permanent custody motion was addressed at the commencement of the hearing, counsel for CSB informed the trial court that Mother had been personally served with the motion on September 9, 2011, when she appeared in court for a review hearing, and that her counsel had consented to service in that manner. Mother did not raise any objection to CSB's representation that she had accepted personal service of the motion. The trial court therefore found that service had been perfected upon Mother.

{¶15} Because Mother did not dispute that the motion had been properly served on her, she has forfeited all but plain error. *In re Mi.H.*, 9th Dist. Nos. 26077 & 26096, 2011-Ohio-6736, ¶ 13, citing *State v. Payne*, 114 Ohio St.3d 502, 2007-Ohio-4642, ¶ 23-24. Although she purports to argue plain error, she has failed to demonstrate that any defect in service affected "the basic fairness, integrity, or public reputation of the judicial process, thereby challenging the legitimacy of the underlying judicial process itself." *Goldfuss v. Davidson*, 79 Ohio St.3d 116 (1997), syllabus.

{¶16} Mother has not even argued how she was prejudiced by any alleged defect in service. Instead, she simply asserts that the record fails to properly document that the permanent custody motion was served on her in strict compliance with R.C. 2151.29 and Juv.R. 16. Although Mother suggests that any failure to comply with the rules of service constitutes reversible error, a defect in the service of a permanent custody motion typically constitutes reversible error because it had due process implications on the parent because the parent received untimely, insufficient, or no notice of the hearing. *See, e.g.*, *In re Thompkins*, 115 Ohio St.3d 409, 2007-Ohio-5238. All of the cases cited by Mother involve parents who did not appear at the permanent custody hearing and claimed on appeal that they had not been given proper notice and, therefore, were deprived of their right to participate in the hearing. *E.g.*, *id.; In re S.S.*, 9th Dist. No. 10CA0010, 2010-Ohio-6374; *In re Keith Lee P.*, 6th Dist. No. L-03-1266, 2004-Ohio-1976.

{¶17} In *Thompkins*, the Ohio Supreme Court emphasized that the purpose of requiring service of a permanent custody motion on parents is to afford them due process prior to terminating their fundamental liberty interest in the care and custody of their child. 115 Ohio St.3d 409, at ¶ 10-14. Due process requires notice, which is reasonably calculated to apprise a parent of the permanent custody hearing, as well as an opportunity to appear and present objections at the hearing. *Id.* at ¶ 13.

{¶18} In this case, Mother does not dispute that she did, in fact, receive timely notice of the permanent custody hearing, appeared at the hearing represented by counsel, and had a full opportunity to defend herself against the motion. Because she has failed to demonstrate that any alleged defect in service of the motion impacted her right to due process or prejudiced her in any way, she cannot demonstrate plain error. Mother's assignment of error is overruled.

III

**{¶19}** Mother's assignment of error is overruled. The judgment of the Summit County Court of Common Pleas, Juvenile Division, is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

BETH WHITMORE
FOR THE COURT

CARR, J.
CONCURS.

DICKINSON, J.
CONCURRING.

{¶20} I concur in the majority's judgment. I would conclude, however, that, by consenting to service on Mother at the review hearing, her lawyer, on her behalf, waived the service that would have otherwise been required rather than simply forfeiting the right to assign error on appeal related to that service. "Whether a particular right is waivable; whether the defendant must participate personally in the waiver; whether certain procedures are required for waiver; and whether the defendant's choice must be particularly informed or voluntary, all depend on the right at stake." *State v. Feliciano*, 9th Dist. No. 09CA009595, 2010-Ohio-2809, at ¶ 61 (Dickinson, P.J., concurring) (quoting *United States v. Olano*, 507 U.S. 725, 733 (1993)). Accordingly, I would not engage in a plain error analysis.

APPEARANCES:

MARTHA HOM, Attorney at Law, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and HEAVEN DIMARTINO, Assistant Prosecuting Attorney, for Appellee.